# UNITED STATES OF AMERICA
## MERIT SYSTEMS PROTECTION BOARD

| | |
|---|---|
| JOSE MATHEWS, | DOCKET NUMBER |
| Appellant, | CH-1221-17-0223-W-2 |
| v. | |
| DEPARTMENT OF VETERANS AFFAIRS, | DATE: May 28, 2024 |
| Agency. | |

## THIS FINAL ORDER IS NONPRECEDENTIAL[1]

Ariel E. Solomon, Esquire, Washington, D.C., for the appellant.

Beth K. Donovan, Esquire, St. Louis, Missouri, for the agency.

### BEFORE

Cathy A. Harris, Chairman
Raymond A. Limon, Vice Chairman

### FINAL ORDER

The appellant has filed a petition for review of the initial decision, which dismissed his individual right of action (IRA) appeal for lack of jurisdiction. Generally, we grant petitions such as this one only in the following circumstances: the initial decision contains erroneous findings of material fact; the initial decision is based on an erroneous interpretation of statute or regulation

---

[1] A nonprecedential order is one that the Board has determined does not add significantly to the body of MSPB case law. Parties may cite nonprecedential orders, but such orders have no precedential value; the Board and administrative judges are not required to follow or distinguish them in any future decisions. In contrast, a precedential decision issued as an Opinion and Order has been identified by the Board as significantly contributing to the Board's case law. *See* 5 C.F.R. § 1201.117(c).

or the erroneous application of the law to the facts of the case; the administrative judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case; or new and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. Title 5 of the Code of Federal Regulations, section 1201.115 (5 C.F.R. § 1201.115). After fully considering the filings in this appeal, we conclude that the petitioner has not established any basis under section 1201.115 for granting the petition for review. Therefore, we DENY the petition for review. Except as expressly MODIFIED to clarify the appropriate standard for disclosures of gross mismanagement, we AFFIRM the initial decision.

### BACKGROUND

The appellant is the Chief of Psychiatry for the agency's St. Louis Medical Center. *E.g.*, *Mathews v. Department of Veterans Affairs*, MSPB Docket No. CH-1221-17-0223-W-1, Initial Appeal File (IAF), Tab 1 at 6; *Mathews v. Department of Veterans Affairs*, MSPB Docket No. CH-1221-17-0223-W-2, Refiled Appeal File (RAF), Tab 13 at 20. In April 2014, he filed a complaint with the Office of Special Counsel (OSC), alleging that the agency engaged in whistleblower retaliation by placing him in a detail assignment while it conducted an investigation about complaints from subordinates. RAF, Tab 6 at 6-21, Tab 13 at 21-31. In December 2016, OSC closed its investigation. RAF, Tab 8 at 4.

After OSC's closeout, the appellant filed this timely IRA appeal. IAF, Tab 1. At his request, the administrative judge dismissed the appeal, without prejudice and for automatic refiling at a later date, to accommodate scheduling conflicts. IAF, Tab 10. After that refiling, the administrative judge developed the record and dismissed the appeal for lack of jurisdiction, without a hearing. RAF, Tab 16, Initial Decision (ID). She found that the appellant met the

exhaustion requirement for nine disclosures and one personnel action but no others. ID at 3-6. She further found that the appellant failed to nonfrivolously allege that any of the disclosures he exhausted with OSC were protected. ID at 6-11.

The appellant has filed a petition for review. *Mathews v. Department of Veterans Affairs*, MSPB Docket No. CH-1221-17-0223-W-2, Petition for Review (PFR) File, Tab 4. The agency has filed a response. PFR File, Tab 8.

## ANALYSIS

The appellant met his burden of proving the timeliness of his petition for review.

The initial decision noted that it would become final on September 4, 2017, unless the appellant filed a petition for review by that date. ID at 12. Days before that deadline, the appellant requested an extension. PFR File, Tabs 1-2. The Office of the Clerk of the Board granted the request, permitting the appellant to file his petition on or before October 5, 2017. PFR File, Tab 3. The Board did not receive the appellant's petition until October 24, 2017, well after that deadline. PFR File, Tab 4 at 1.

The appellant bears the burden of showing that his petition for review was timely filed. *Corum v. U.S. Postal Service*, 118 M.S.P.R. 288, ¶ 12 (2012). Given the unexplained late receipt of the appellant's petition, the agency argued that we should dismiss it as untimely filed without good cause. PFR File, Tab 8 at 11-12. The Clerk of the Board issued an order instructing the appellant to present argument and evidence regarding the timeliness of his petition. PFR File, Tab 9. In doing so, he suggested that the appellant address several pertinent facts. These facts included that the envelope accompanying the petition suggested that the appellant or his attorney used their own equipment to print a 1-day priority shipping label on October 4, 2017, a day before the designated deadline, but the envelope contained no postmark to show when he placed the package in the stream of mail or otherwise explain the Board's receipt 20 days

later.  PFR File, Tab 4 at 32.  He also noted, *inter alia*, that the agency's copy of the petition contained similar discrepancies when comparing the date the shipping label was printed, the speed of service selected, and the ultimate receipt of the package.  PFR File, Tab 6 at 4, 6, 10, 12.

The appellant's attorney responded to the timeliness order with a sworn affidavit.  PFR File, Tab 10 at 6-9.  Among other things, appellant's counsel asserts that he deposited the petition for review into the stream of mail on October 4, 2017, using a U.S. Postal Service collection box within just a few blocks of both his office and the offices of the Board.  *Id*. at 7, 9.  He suggests that any delay between that October 4 deposit into the stream of mail and the Board's receipt, on October 24, must have been caused by the Postal Service.  *Id*. at 8-9.

Although the agency continues to argue that we should reject the appellant's petition for review as untimely, it has not presented any evidence to rebut the sworn statement of appellant's counsel.  PFR File, Tab 11.  Therefore, that sworn declaration is sufficient to establish that the petition was timely filed. *See Jordan v. Department of Justice*, 54 M.S.P.R. 609, 611 (1992) (explaining that sworn statements that are not rebutted are competent evidence of the matters asserted therein).  Accordingly, we find that the appellant has met his burden to prove that his petition for review was timely filed.

The appellant met his burden of proving exhaustion for only nine disclosures.

As previously mentioned, the administrative judge found that the appellant met his burden of proving exhaustion concerning nine alleged disclosures.  ID at 3-6.  On review, the appellant does not specifically identify any other alleged disclosures that were exhausted.  PFR File, Tab 4 at 10-11.  However, he alludes to a sworn statement that he submitted below, RAF, Tab 5 at 4-19, and the administrative judge's conclusion that he failed to prove exhaustion for any additional disclosures discussed within that statement, ID at 6 (referencing IAF, Tab 1 at 17-20; RAF, Tab 5 at 11-12, 14-19).

To establish the Board's jurisdiction over an IRA appeal, such as this, an appellant must have exhausted his administrative remedies before OSC and present nonfrivolous allegations of the following: (1) he engaged in whistleblowing by making a protected disclosure under 5 U.S.C. § 2302(b)(8), or engaged in other protected activity as specified in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D); and (2) the disclosure or activity was a contributing factor in the agency's decision to take or fail to take a personnel action as defined by 5 U.S.C. § 2302(a)(2)(A). 5 U.S.C. §§ 1214(a)(3), 1221(a); *Williams v. Department of Defense*, 2023 MSPB 23, ¶ 8.

The Board recently clarified the substantive requirements of exhaustion. *Chambers v. Department of Homeland Security*, 2022 MSPB 8, ¶¶ 10-11. The requirements are met when an appellant has provided OSC with sufficient basis to pursue an investigation. *Id.*, ¶ 10. The Board's jurisdiction is limited to those issues that have been previously raised with OSC. *Id.* (citation omitted). However, an appellant may give a more detailed account of his whistleblowing activities before the Board than he did to OSC. *Id.* (citation omitted).

An appellant may demonstrate exhaustion through his initial OSC complaint or correspondence with OSC. *Id.*, ¶ 11. An appellant may also establish exhaustion through other sufficiently reliable evidence, such as an affidavit or declaration attesting that the appellant raised with OSC the substance of the facts in the Board appeal. *Id.* (citation omitted). To establish Board jurisdiction, the appellant must prove exhaustion with OSC by preponderant evidence, not just present nonfrivolous allegations of exhaustion. *Id.*; 5 C.F.R. § 1201.57(c)(1).

We agree that the appellant met his burden of proving exhaustion for the nine disclosures identified by the administrative judge. ID at 3-6. The exhaustion of those matters was proven by the appellant's initial OSC complaint, which he provided. RAF, Tab 6 at 16-20. The question that remains is whether the appellant proved that he exhausted any other disclosures with OSC—ones not

identified in his initial OSC complaint. Like the administrative judge, we find that he did not.

With his initial appeal, the appellant attached a lengthy narrative and argument in support of his whistleblower retaliation claim. IAF, Tab 1 at 15-22. Among other things, the narrative describes a number of alleged disclosures and retaliatory personnel actions in varying detail. *Id*. at 16-20. However, most importantly, this recounting of alleged disclosures and retaliatory personnel actions does not indicate whether the appellant exhausted the same with OSC.[2] *Id*. at 15-22.

The appellant's next substantive pleading summarily asserts that he exhausted his administrative remedies with OSC, while citing to a sworn statement and his initial OSC complaint. RAF, Tab 4 at 13 (referencing RAF, Tabs 5-6). The sworn statement describes numerous alleged disclosures and retaliatory personnel actions, once again in varying detail. RAF, Tab 5 at 8-19. Among other things, the statement is rather ambiguous about whether the appellant made all of the described disclosures. The appellant specifically takes responsibility for some disclosures, while he is less clear as to others. In an example to illustrate the latter, the appellant alleged that "many of the below disclosures were also investigated by the Office of Inspector General . . .: psychiatrists were not respecting their tour of duty time commitments." *Id*. at 11.

Aside from the ambiguity regarding who made some of the disclosures described in the appellant's sworn statement, it goes on to include the following assertion regarding the exhaustion requirement:

> Through counsel, I filed a complaint with the Office of Special Counsel (OSC) on or around May 22, 2014, and I amended my complaint as necessary following additional retaliation July 18,

---

[2] Even if this statement did address the exhaustion requirement, it would be of little consequence because the statement is undated, unsigned, unsworn, and seemingly drafted by the appellant's attorney. IAF, Tab 1 at 15-22; *see Hendricks v. Department of the Navy*, 69 M.S.P.R. 163, 168 (1995) (recognizing that the statements of a party's representative in a pleading do not constitute evidence).

> 2014, and April 20, 2015. In each complaint and amended complaint, I specifically delineated my protected disclosures and the myriad of prohibited personnel practices to which I was subjected as a result of those disclosures.

*Id.* at 19.

We first note that while this statement may imply that additional disclosures and personnel actions were exhausted through amendments to his initial OSC complaint, it does not clearly articulate and evidence the same. The statement is, instead, noticeably ambiguous. It does indicate that the appellant "specifically delineated [his] disclosures" in each of his OSC complaints, but it does not clearly indicate whether that includes each and every disclosure discussed in his sworn statement, some of them, or just those presented in his original OSC complaint. RAF, Tab 5 at 4-19. And as discussed below, the appellant failed to present supportive evidence that would have cleared up that ambiguity.

Although the appellant cited a July 18, 2014 amendment to his initial OSC complaint, he failed to submit a copy of that document or describe its contents. *Id.* at 19. The appellant did submit a letter from his attorney to his employing agency dated August 5, 2014, alleging various improprieties. RAF, Tab 7 at 4-6. However, to the extent that this letter could be associated with his alleged July 18, 2014 amendment to his OSC complaint, the appellant did not claim that he provided the letter to OSC. *Compare* RAF, Tab 5 at 19, *with* RAF, Tab 7 at 4-6.

Turning to his alleged April 20, 2015 amendment to his OSC complaint, the appellant submitted a letter from his attorney to his employing agency with the same date. RAF, Tab 5 at 19, Tab 7 at 7-12. The letter includes what appears to be the email address of an individual at OSC as a recipient to be carbon copied, but we found no corresponding email message or other indication that the letter was actually provided to that individual. RAF, Tab 7 at 11-12. Assuming, without deciding, that the letter to his employing agency was provided to

someone at OSC, that individual is not the investigator who signed off on OSC's close-out letter. *Compare* RAF, Tab 7 at 11-12, *with* RAF, Tab 8 at 4. Further calling into question the relevance of this letter to the exhaustion requirement, it does not include pertinent information, such as the appellant's OSC file number, MA-14-2840, instead referencing "Our File No. 13-1091." *Compare* RAF, Tab 7 at 7-12, *with* RAF, Tab 8 at 4. Next, while the letter does describe three alleged disclosures, they appear unrelated to those identified in the appellant's sworn statement. *Compare* RAF, Tab 5 at 8-12, *with* RAF, Tab 7 at 8-9. Finally, although the appellant did submit this letter, he did not reference it when arguing that he met the exhaustion requirement. Instead, when arguing that he met the exhaustion requirement, the appellant referenced only the pleading containing his initial OSC complaint and his sworn statement. RAF, Tab 4 at 13 (referencing RAF, Tabs 5-6). His petition for review is similarly silent as to the relevance of the April 20, 2015 letter, citing only his sworn statement for purposes of exhaustion. PFR File, Tab 4 at 11 (referencing RAF, Tab 5 at 4-19).

The final piece of evidence provided for purposes of the exhaustion requirement is OSC's close-out letter. IAF, Tab 1 at 23; RAF, Tab 8 at 4. However, that letter is silent as to the substance of the matters the appellant raised before OSC. The close-out letter references OSC's predetermination letter, "that set forth [OSC's] factual and legal determinations," but the predetermination letter is not in the record, so we are unable to consider it for purposes of exhaustion. IAF, Tab 1 at 23; RAF, Tab 8 at 4.

After considering the appellant's arguments and evidence, we agree with the administrative judge that the appellant did not meet his burden of proving exhaustion for any disclosures beyond those described in his initial OSC complaint. Although the appellant's sworn statement could be read as indicating that additional disclosures were exhausted with OSC, it does not clearly articulate and evidence the same. RAF, Tab 5 at 4-19. The letter to his employing agency with a carbon copy to an OSC email address fares no better, given the ambiguity

of whether that letter reached relevant officials and its inconsistency with the allegations presented in this IRA appeal. RAF, Tab 7 at 7-12.

Both below and on review, the appellant indicated that he is awaiting the results of a pending Freedom of Information Act (FOIA) request with OSC to obtain materials relevant to the exhaustion requirement. RAF, Tab 4 at 13; PFR File, Tab 4 at 29-30. However, the appellant failed to present any corresponding documentation, such as his initial FOIA request or a response from OSC. Moreover, the appellant has failed to adequately explain why he cannot prove exhaustion without the results of his FOIA request. Among other things, the appellant has not explained why he lacks copies of OSC's predetermination letter or other correspondence with OSC, despite being represented by an attorney since filing his initial OSC complaint. RAF, Tab 5 at 19.

In sum, the appellant met his burden of proving exhaustion for the nine disclosures identified by the administrative judge because those were included in the initial OSC complaint he provided below. He has not met his burden of proving that he exhausted any additional disclosures by preponderant evidence.[3]

<u>The appellant failed to nonfrivolously allege that the disclosures he exhausted with OSC were protected.</u>

The administrative judge found that the appellant failed to present nonfrivolous allegations that the nine alleged disclosures exhausted before OSC (*Disclosure A* through *Disclosure I*) were protected. ID at 6-11. The administrative judge found that *Disclosures A*, *B*, *C*, *D*, and *G* were emails discussing policy in which the appellant did not claim wrongdoing under section 2302(b)(8). ID at 8-9. For *Disclosures E* and *H*, the administrative judge found that the appellant made recommendations about managerial actions, with no indication that the agency's proposed alternative approaches fell within any

---

[3] Because we find that the appellant failed to nonfrivolously allege that any of the disclosures he exhausted with OSC were protected, we need not address the appellant's arguments concerning exhaustion of additional personnel actions beyond the one identified by the administrative judge. PFR File, Tab 4 at 19-22.

category of wrongdoing protected under section 2302(b)(8). ID at 9. Finally, she found that *Disclosure F* was a robust discussion of what approach or policy to apply, but not a protected disclosure, and *Disclosure I* was not a disclosure at all because the appellant was merely a passive participant in the email discussion. ID at 10-11.

A protected disclosure is a disclosure of information that an appellant reasonably believes evidences a violation of any law, rule, or regulation, gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety. *Linder v. Department of Justice*, 122 M.S.P.R. 14, ¶ 12 (2014). To establish that an appellant made a protected disclosure, he need not prove that the matter disclosed actually established one of the categories of wrongdoing listed under 5 U.S.C. § 2302(b)(8); rather, he must show that the matter disclosed was one that a reasonable person in his position would believe evidenced any of the specified categories of wrongdoing. *Webb v. Department of the Interior*, 122 M.S.P.R. 248, ¶ 6 (2015). Again, for purposes of establishing jurisdiction, the appellant need not prove that he made a protected disclosure, but he must present nonfrivolous allegations of a protected disclosure. *Supra* p. 5; *see* 5 C.F.R. § 1201.4(s) (defining a nonfrivolous allegation as one that, if proven, could establish the matter at issue). As the U.S. Court of Appeals for the Federal Circuit explained, "the question of whether the appellant has non-frivolously alleged protected disclosures [or activities] that contributed to a personnel action must be determined based on whether the employee alleged sufficient factual matter, accepted as true, to state a claim that is plausible on its face." *Hessami v. Merit Systems Protection Board*, 979 F.3d 1362, 1364, 1369 (Fed. Cir. 2020).[4]

[4] The *Hessami* decision further held that the Board "may not deny jurisdiction by crediting the agency's interpretation of the evidence as to whether the alleged disclosures fell within the protected categories or whether the disclosures were a contributing factor to an adverse personnel action." *Hessami*, 979 F.3d at 1369. In this instant appeal, the agency submitted just a single pleading about Board jurisdiction, RAF, Tab 13, and the administrative judge only cited it to give some background

On review, the appellant argues that he met his jurisdictional burden of presenting nonfrivolous allegations because he reasonably believed that the agency's actions constituted gross mismanagement, violations of law, rule or regulation, abuses of authority, and dangers to public health or safety. PFR File, Tab 4 at 12-19. He broadly asserts, among other things, a "depraved indifference for human life," "knowing and continuing malpractice," "knowing and uncorrected misdiagnoses of life threatening diseases," and "unnecessary surgeries." PFR File, Tab 4 at 18-19. We are not persuaded. As further detailed below, the appellant has overstated the significance and content of his communications, which he submitted while attempting to meet his jurisdictional burden. *E.g.*, RAF, Tab 6 at 17-19; PFR File, Tab 4 at 13-14.

The appellant described *Disclosure A* as one referencing excessive wait times and the willful failure of management to initiate corrective measures. *E.g.*, RAF, Tab 6 at 17-18; PFR File, Tab 4 at 13. Like the administrative judge, we find that this mischaracterizes what the appellant actually revealed. ID at 4 & n.3. The email the appellant identified as *Disclosure A* is one to the Chief of Staff, discussing plans of flexibly deploying one psychiatrist, psychiatrist salaries, and the appellant's hopes of making his department run more effectively. RAF, Tab 6 at 17-18, Tab 15 at 26-28. On that last point, the email does refer to his department as "a total disaster" and a "mess." RAF, Tab 15 at 27. It also generally references a history of individuals not being held accountable. *Id.* However, these references were in the context of the appellant's plans to oversee improvement. Nothing in this email reveals specific wrongdoing protected under section 2302(b)(8). *See, e.g.*, *Mc Corcle v. Department of Agriculture*, 98 M.S.P.R. 363, ¶ 24 (2005) (recognizing that vague allegations of wrongdoing do not rise to the level of nonfrivolous allegations of a protected disclosure).

---

information, ID at 2. Consistent with *Hessami*, the administrative judge relied on the appellant's arguments and evidence, not the agency's, to find that the appellant did not establish jurisdiction. ID at 3-11.

The appellant described *Disclosure B* as revealing inadequate medical care to veterans. RAF, Tab 6 at 18; PFR File, Tab 4 at 16. But again, the actual email at issue contains no revelation of the type of wrongdoing protected under section 2302(b)(8). As the administrative judge recognized, when the appellant took over as Chief of Psychiatry, he proposed changes that would effectively place more emphasis on quantitative measures, such as the number of patients seen per day. ID at 2; *e.g.*, RAF, Tab 15 at 32-33. When one clinician emailed him concerns that this might negatively impact the quality of care rendered, RAF, Tab 15 at 31-32, the appellant responded with an explanation of his "vision for [the] Department," *id*. at 30-31. That email, *Disclosure B*, does make arguments about how he believed it was both possible and ethically required that the agency serve more patients per day, rather than provide extraordinary care to some at the expense of others having "unacceptable" wait times. *Id*. But the email is best summarized as a general discussion of how the agency should balance quantity and quality of care, not a disclosure of specific wrongdoing cognizable under section 2302(b)(8). *Id*. Such general philosophical or policy disagreements are not protected unless they separately constitute a protected disclosure of one of the categories of wrongdoing under section 2302(b)(8). *Webb*, 122 M.S.P.R. 248, ¶ 8 (finding further that an appellant's disagreement with the agency's directive separating and reassigning duties of an agency subunit did not evidence the type of wrongdoing specified in section 2302(b)(8)).[5]

The appellant described *Disclosure C* as revealing a dangerous failure to increase access to care and a failure of management to address poor performance. RAF, Tab 6 at 18; PFR File, Tab 4 at 16. The actual email at issue is one that

_____

[5] To the extent that the administrative judge suggested that the appellant's policy disagreements must be more than "debatable," we modify this finding. ID at 8, 11. An appellant alleging gross mismanagement is not required to prove that it is not "debatable among reasonable people." *Webb*, 122 M.S.P.R. 248, ¶ 9. Although the administrative judge referred to such a requirement, she did not discount any disclosure on this basis. ID at 9. Instead, she found that the appellant did not disclose any wrongdoing under section 2302(b)(8). ID at 9-11.

further discusses his plans for quantitative measurements of performance, indicates that clinicians had expressed resistance to such measurements, and requests input about his plan for achieving quantitative goals. RAF, Tab 15 at 35-37. So, again, the communication is a discussion of policy, but there appears to be nothing in that discussion that evidences the type of wrongdoing protected by section 2302(b)(8).

The appellant described *Disclosure D* as revealing the improper and unethical denial of care to a particular veteran. RAF, Tab 6 at 18; PFR File, Tab 4 at 16. The actual emails at issue explain how a patient seeking hormone replacement therapy to transition a gender identity was contesting the recommendations of a psychologist and, as a result, the appellant was asked to review the psychologist's report. RAF, Tab 6 at 41-45, Tab 15 at 46-47. The appellant's messages describe perceived shortcomings in the psychologist's evaluation or, more precisely, the psychologist's report about the evaluation. RAF, Tab 6 at 41-45. One example of the perceived shortcomings is that the psychologist first referred to this patient by using the title, "Mr.," before apologizing for having done so. *Id*. at 44. Another example, which the appellant described as the "most troubling aspect" of the psychologist's evaluation, is that she reportedly failed to corroborate the patient's claim that the patient's family supported the patient's desire to undergo hormone therapy. *Id*. at 45.

In another case involving patient care, the Board found that several disclosures made by a nurse were protected because they revealed a substantial and specific danger to public health and safety. *Chavez v. Department of Veterans Affairs*, 120 M.S.P.R. 285 (2013). Some examples of those protected disclosures included a failure to properly maintain medical carts, which was likely to cause harmful delays for patients in need of immediate treatment; a failure to change patient dressings, which was likely to result in infections; and a coworker's request that the appellant in that case administer both narcotics and other pre-drawn syringes that had been prepared by another nurse, which was

likely to cause patients to receive the wrong medications. *Id.*, ¶¶ 9, 19-21, 23. The Board reached a similar conclusion in another case involving patient care. *Parikh v. Department of Veterans Affairs*, 116 M.S.P.R. 197 (2011). The appellant therein disclosed several specific instances of misdiagnoses and patients receiving treatment that was not commensurate with the severity of their conditions, e.g., staff misdirecting a patient to the general medical floor instead of the intensive care unit, resulting in that patient deteriorating to the point that he required intubation. *Id.*, ¶¶ 12-18 .

*Disclosure D*, which amounted to a recommendation that the patient's request for a second opinion be granted, appears to be notably dissimilar—less serious—when compared to those examples in terms of the likelihood of harm, whether such harm is expected in the foreseeable future, and its anticipated severity. *See Chambers v. Department of the Interior*, 602 F.3d 1370, 1376 (Fed. Cir. 2010) (recognizing those factors as relevant in determining whether a disclosure qualifies as a substantial and specific danger to public health or safety). The appellant did not, for example, indicate that the patient was misdiagnosed or denied urgently needed treatment. In fact, the appellant concluded his message by emphasizing that he was not commenting on the patient's diagnoses or suitability for hormone replacement, but rather was expressing concern that the psychologist's report did not adequately answer pertinent questions. RAF, Tab 6 at 45. Accordingly, while the appellant's messages may reveal valid disagreement with the sufficiency of another clinician's evaluation report, they do not reveal a substantial and specific danger to public health and safety or any other wrongdoing protected under the whistleblower statute.

The appellant described *Disclosure E* as revealing the deaths of two veterans related to their denial of medical care and the absence of a proper investigation into those deaths. RAF, Tab 6 at 18; PFR File, Tab 4 at 16. The actual email at issue acknowledges the appellant's prior request for a root cause

analysis of two veterans' cases. RAF, Tab 15 at 50. It further acknowledges that a root cause analysis was occurring for one but officials determined that no such analysis was indicated for the other. *Id*. The message generally refers to the appellant's feeling "that there were systemic issues that needed to be resolved," and refers to one of the veterans being "not assessed appropriately," but provides little else in terms of details. *Id*. It does not contain specific allegations of wrongdoing. *See Mc Corcle*, 98 M.S.P.R. 363, ¶ 24.

The appellant described *Disclosure F* as revealing that certain agency officials improperly turned away a veteran seeking care. RAF, Tab 6 at 19; PFR File, Tab 4 at 17. The actual email chain at issue reflects a less troublesome story. The email chain begins with an outpatient clinic note documenting a veteran's interaction with a registered nurse who also served as a mental health treatment coordinator. RAF, Tab 15 at 55-56. That note indicates that the patient was taking medications as prescribed and he denied any mental health issues at the time, but arrived as a walk-in because he needed to schedule an appointment and get medication refills. *Id*. at 55. During this visit, the veteran complained that he tried to schedule the appointment over the telephone but was unable to reach the proper person or leave a message, resulting in his hanging up in frustration. *Id*. The note concludes with the nurse authorizing a clerk to schedule an appointment for the veteran and more broadly recommending that the clinic reinstate a voicemail answering service. *Id*. at 55.

The appellant responded to the message containing the aforementioned note by asking a couple of agency employees to contact the veteran, make sure his needs had been met, and explain how he can get in touch in the future. *Id*. at 54. The appellant further asked for an explanation as to what strategy would prevent recurrence of this type of complaint and improve access. *Id*. A recipient of the appellant's email replied, suggesting that nursing staff should have tried to have the veteran seen by his treating clinicians on the spot, during his walk-in visit, rather than scheduling an appointment for him at a later date. *Id*. at 54. The

appellant then asked that recipient to look into the matter further by determining how busy the providers were at the time. *Id*. at 53. However, we note that the complaint itself does not clearly indicate that the veteran wanted to be seen that day; the veteran is quoted as arriving at the clinic in person "so [he] could make an appointment." *Id*. at 55. Moreover, while the email chain indicates that the veteran was not seen on that particular day, it contains no indication that the veteran was altogether denied care or subjected to a wait that endangered his health. Again, the veteran denied mental health issues and indicated that he was taking medications as prescribed. So while *Disclosure F* may call into question whether the agency could have provided more efficient service, it does not disclose the type of wrongdoing protected under the whistleblower statute.

The appellant described *Disclosure G* as revealing unethical treatment of a hallucinating veteran that later assaulted another veteran and agency errors that led to that assault. RAF, Tab 6 at 19; PFR File, Tab 4 at 17. In fact, the email was instead the appellant's response to another clinician's message about the incident in the context of ongoing discussions about measuring care quantitatively versus qualitatively. RAF, Tab 15 at 61-67. The appellant's message was yet another instance of him discussing plans to increase the number of patients seen per day. *Id*. at 61-63. More specifically, the appellant's message described how psychiatrists were seeing an average of 6.1 patients per 8 hours of work, but he wanted that number to more than double, so the clinic could reduce the average wait time for patient visits below its current 24.35 to 29.5 days,[6] and possibly

---

[6] The appellant has not identified, and we are not aware of, any law, rule, or regulation setting the maximum allowable wait time when the appellant sent this June 2013 email. The agency has since implemented regulations generally setting a wait time goal of 30 days or less from the date a patient wishes to be seen. Expanded Access to Non-VA Care Through the Veterans Choice Program, 79 Fed. Reg. 65571, 65585 (Nov. 5, 2014) (codified as amended at 38 C.F.R. § 17.1505). The agency set this goal pursuant to the Veterans Access, Choice, and Accountability Act of 2014, Pub. L. No. 113-146, § 101(s), 128 Stat. 1754, 1764-65. Even assuming a 30-day wait time goal existed in June 2013, and that failure to meet this goal was a regulatory or statutory violation, the information the appellant provided in his email suggests that his unit was exceeding the goal. RAF, Tab 15 at 61.

reduce attrition. *Id*. at 61-62. The appellant acknowledged that this would require psychiatrists to spend less time with patients during each visit. *Id*. at 62-63. But according to the appellant, veterans would be better served by seeing them more often, even if it required that their visits be more cursory. *Id*.

We recognize that the message at issue in this disclosure, like several others, includes language indicating that the appellant was attempting to portray his view emphatically. For example, the appellant suggests that employees should visualize a loved one when considering whether they are providing the best care possible, and he indicated that they "MUST know ALL of [their] patients," they "MUST know" which ones need more intensive care, and "[t]his can ONLY happen" by increasing the frequency of patient visits, even if doing so resulted in shorter visits. *Id*. Ultimately, though, the message amounts to general philosophical or policy disagreement with other clinicians in terms of balancing quality and quantity of patient visits, not the type of specific wrongdoing protected under section 2302(b)(8). *Webb*, 122 M.S.P.R. 248, ¶ 8; *cf. Parikh*, 116 M.S.P.R. 197, ¶¶ 12-15, 19-22 (finding that disclosures of systemic problems at an agency medical center that resulted in untimely and inadequate patient care, with specific examples, were protected).

The appellant described *Disclosure H* as revealing the agency's attempt to cover up a suicide attempt, the lack of corresponding investigation, and the failure to implement corrective measures the appellant suggested. RAF, Tab 6 at 19; PFR File, Tab 4 at 17. The actual email chain at issue is one between the appellant and the Acting Chief of Mental Health (ACMH) the day after the suicide attempt, wherein the appellant recommended the probationary termination of a particular employee. RAF, Tab 15 at 70-75.

The email chain began with the appellant recounting that the agency admitted a patient for inpatient treatment following suicidal ideations. *Id*. at 73. One afternoon, following several days of treatment, the patient reported to a nurse that he was again experiencing suicidal ideations. *Id*. That nurse evaluated the

patient, talked with him at length, and paged a psychiatrist to inform her of the patient's condition. *Id*. Without personally seeing the patient, the psychiatrist changed his status so that the patient would receive one-on-one observation, presumably to ensure his safety. *Id*. At some unidentified time that same afternoon or evening, the patient began to pull down a ventilation grate, in an apparent attempt to prepare to hang himself. *Id*. at 74. The observing nurse diffused the situation, reported it to the psychiatrist, and continued to observe him. *Id*. As of a 9:00 a.m. huddle with the appellant the next morning, the psychiatrist had not yet seen the patient. *Id*. However, according to the appellant, the psychiatrist first claimed that she had, then claimed that she had not. *Id*. According to the appellant, the psychiatrist also indicated that the appellant had been unable to view her report about the incident because she simply failed to close the report by signing it, but that simply was not true. *Id*. at 74-75. The appellant recommended probationary termination of the psychiatrist based on his concerns about her delivery of care and candor. *Id*. at 75.

The ACMH responded to the appellant's message by recommending that he counsel the psychiatrist, closely monitor her work, and take care to document her shortcomings. *Id*. at 72. He also expressed some agreement that probationary termination may be appropriate. *Id*. The appellant replied, expressing a reluctance to counsel the psychiatrist or otherwise delay removing her. *Id*. at 71-72. The ACMH then responded, again, noting some possible pitfalls in moving forward with termination based on this one incident, but suggesting that they could seek input from the Chief of Staff before making a final determination. *Id*. at 71.

Although the appellant has suggested that this email chain shows that he disclosed an attempt to conceal a suicide attempt, it actually reflects management discussions of human resources decisions—discussions that all occurred just 1 day after the suicide attempt. We are cognizant of the grave consequences that

could result depending on the sufficiency of the probationary psychiatrist's treatment. However, by the appellant's own recounting, the psychiatrist responded to the patient's suicidal ideations by placing him under one-on-one observation, which may have saved his life. While the appellant's emails suggest that the psychiatrist also should have visited the patient and completed her report hours earlier than she did, we are unable to conclude that this amounts to wrongdoing protected under the whistleblower statute.

The appellant described *Disclosure I* as revealing a clinician's delay that was contrary to agency regulation and protocol. RAF, Tab 6 at 19. As the administrative judge recognized, and the appellant appears to no longer dispute, the actual emails identified as *Disclosure I* were sent to the appellant, not from the appellant. ID at 10; RAF, Tab 15 at 77-79. Therefore, regardless of their content, they do not constitute a disclosure of any kind by the appellant.

In an argument that appears to implicate *Disclosure E* and *Disclosure H*, the appellant asserts that a protected disclosure does not lose its protected status just because the disclosure also includes a proposed fix to the violation of law, rule, regulation, or other wrongdoing, and the administrative judge erred in finding otherwise. PFR File, Tab 4 at 15; ID at 9. However, this argument mischaracterizes the administrative judge's findings. The administrative judge did not find that an otherwise protected disclosure lost its protected status because the appellant proposed corrective measures; she found that the appellant's communications were not protected because they simply discussed the exercise of managerial discretion or policy disagreements, without any specific assertion of wrongdoing protected under section 2302(b)(8). ID at 4-11.

In another argument that appears to implicate *Disclosure A* through *Disclosure H*, the appellant asserts that the administrative judge erroneously replaced her judgment with that of the appellant, a trained forensic psychiatrist, for purposes of determining whether he had a reasonable belief that he was disclosing the type of wrongdoing covered under section 2302(b)(8). PFR File,

Tab 4 at 15-16. He suggests that expert testimony from a medical provider would support his conclusions. *Id*. at 18. But again, the appellant's argument mischaracterizes the administrative judge's findings. As our discussion above demonstrates, the appellant has overstated the content and significance of his disclosures. The administrative judge's analysis reflects the same, and she applied the correct standard of a reasonable person in the appellant's position. ID at 4-11; *see supra* p. 10.

The appellant's remaining arguments are unavailing.

On review, the appellant argues that he has established the contributing factor criterion. PFR File, Tab 4 at 22-24. But we need not address the contributing factor criterion in the absence of a nonfrivolous allegation of a protected disclosure. *Chianelli v. Environmental Protection Agency*, 86 M.S.P.R. 651, ¶ 17 (2000), *aff'd per curiam*, 8 F. App'x 971 (Fed. Cir. 2001).

The appellant also argues that the administrative judge erred in closing the record on jurisdiction before providing him an opportunity to rebut the agency's arguments. PFR File, Tab 4 at 24-25 (referencing 5 C.F.R. § 1201.59(c) (providing that once the record closes, additional evidence and argument will not be accepted unless, as relevant here, it is in rebuttal to new argument or evidence submitted by the other party just before the close of record)). However, that argument misrepresents the record, by implication. In fact, while the administrative judge's jurisdictional orders did contemplate generally only the appellant's argument and evidence to meet his burden and the agency's response, it also noted that the Board's regulations required that a party be able to rebut new argument or evidence presented just before the close of record. IAF, Tab 3 at 7-8; RAF, Tab 3 at 7-8; *see* 5 C.F.R. § 1201.59(c). There is nothing in the record suggesting that the appellant attempted to do so.

Finally, the appellant argues that due process requires that he be allowed to engage in discovery on the issue of jurisdiction. PFR File, Tab 4 at 25-26. The administrative judge informed the parties that they could immediately begin

engaging in discovery approximately 4 months prior to the ultimate deadline for his jurisdictional response. IAF, Tab 2 at 3; RAF, Tab 3 at 7-8. Thus, in the absence of a motion to compel, the appellant does not state a basis to grant review. *See Szejner v. Office of Personnel Management*, 99 M.S.P.R. 275, ¶ 5 (2005) (declining to consider an appellant's argument on review that the agency failed to respond to his discovery requests because he did not file a motion to compel), *aff'd*, 167 F. App'x 217 (Fed. Cir. 2006).

## NOTICE OF APPEAL RIGHTS[7]

The initial decision, as supplemented by this Final Order, constitutes the Board's final decision in this matter. 5 C.F.R. § 1201.113. You may obtain review of this final decision. 5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file. 5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction. If you wish to seek review of this final decision, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements. Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case. If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

---

[7] Since the issuance of the initial decision in this matter, the Board may have updated the notice of review rights included in final decisions. As indicated in the notice, the Board cannot advise which option is most appropriate in any matter.

**(1) Judicial review in general**.  As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be <u>received</u> by the court within **60 calendar days** of <u>the date of issuance</u> of this decision.   5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**(2) Judicial or EEOC review of cases involving a claim of discrimination**.  This option applies to you <u>only</u> if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination.  If so, you may obtain judicial review of this decision—<u>including a disposition of your discrimination claims</u>—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** <u>after you</u>

receive this decision. 5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. 420 (2017). If you have a representative in this case, and your representative receives this decision before you do, then you must file with the district court no later than **30 calendar days** after your representative receives this decision. If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security. *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of your discrimination claims only, excluding all other issues. 5 U.S.C. § 7702(b)(1). You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** after you receive this decision. 5 U.S.C. § 7702(b)(1). If you have a representative in this case, and your representative receives this decision before you do, then you must file with the EEOC no later than **30 calendar days** after your representative receives this decision.

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C.  20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C.  20507

**(3) Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012**.  This option applies to you only if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D). If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8), or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review either with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.[8]  The court of appeals must receive your petition for review within **60 days** of the date of issuance of this decision. 5 U.S.C. § 7703(b)(1)(B).

---

[8] The original statutory provision that provided for judicial review of certain whistleblower claims by any court of appeals of competent jurisdiction expired on December 27, 2017.  The All Circuit Review Act, signed into law by the President on July 7, 2018, permanently allows appellants to file petitions for judicial review of MSPB decisions in certain whistleblower reprisal cases with the U.S. Court of Appeals for the Federal Circuit or any other circuit court of appeals of competent jurisdiction. The All Circuit Review Act is retroactive to November 26, 2017.  Pub. L. No. 115-195, 132 Stat. 1510.

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

*Gina K. Grippando*

FOR THE BOARD:        _____
                      Gina K. Grippando
                      Clerk of the Board
Washington, D.C.